We call the last case for today, 2018-60606, State of Texas et al. v. United States EPA et al. Thank you, Your Honor, and may it please the Court, Bill Davis for Texas. In modifying the State's Bexar County attainment designation, EPA wrongly refused even to consider the photochemical modeling data alongside the relevant monitored data. But no matter how the Court ultimately rules on that point, it's important to the State that the decision in this case accurately describe the designation process itself. Section 7407d.1 provides that States make designations, not mere recommendations, and that EPA presumptively promulgates those designations as submitted by the States. Now, EPA has a modification power, but that power is limited to instances in which it's necessary  That's in contrast to language in the next part of that provision that gives EPA the power to make whatever appropriate designations it wants to when a State does not submit designations. You're on a pretty sharp distinction between necessary and appropriate. That's an important premise of your argument. It's just a matter of table setting for the designations process, it is, Your Honor. And those two words have different dictionary definitions, and in the Clean Air Act context, the Supreme Court in Michigan v. EPA and Union Electric v. EPA both noted that necessary means something that has to be done. And so EPA has come back and said that we're cherry-picking dictionary definitions, but really there's no dispute about what necessary means in this context. What am I to make of when I look at 7407, I go back and look at C. I know you're looking at a subsequent section, but C says the administrator shall, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major interstate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. So is the statute sort of blending the use of necessary and appropriate? Well, I think different parts of the Clean Air Act do sometimes blend those. So if we look, for instance, at what the Supreme Court said in Michigan v. EPA, that was a provision of the Act that required something to be both necessary and appropriate. And the court said there that if it was just one of those things or the other, the analysis would be different. But to get back to what necessary means in this provision, there's really no dispute because on page 35138 of the challenge action, EPA says that necessary authorizes it to make modifications that are required to make the designation comply with the statutory language. Do you have to agree with your table setting for Texas to advance a position here, or is there something in the meal that would help Texas? I'm sorry, Your Honor. I just called it a meal because you said you were setting the table. Ah, okay. I'm just trying to go with your metaphor. Yes, exactly. What if we don't see any big semantic? Do you have to win on the semantic point to win this case? Well, the big fight here is about the Dictionary Act as the case relates to Bexar County. Our point about the designations provision is that parties, EPA, including Texas, has used kind of loose language on this in the past. I think it would be helpful if the court just followed the text of the statute on that. But moving to the meal, as Your Honor put it, the dispute really comes down to whether the Dictionary Act applies here. So under Section 7407D1A2. Did you raise that below? I'm sorry? Did you raise the Dictionary Act below? No, we did not. Why isn't it forfeited? How can you argue it now? Well, it's not forfeited, Your Honor, because the Dictionary Act is something that courts must consult when construing any act of Congress. That's something that the Supreme Court said in Hobby Lobby. And so it would be like saying that a party has to tell the federal government that the singular includes the plural or the word person includes corporation. These are just background principles. And the state's designation letter said that under the statutory text and the relevant modeling data, the state could designate Bexar County an attainment area. And that's all it needed to do to put this before the agency. Now, I mentioned the modeling data, but the monitored data is also relevant because the Dictionary Act looks to the context of the statute. And if I could just make a brief point on that, the broadest context here that we're talking about is the Clean Air Act's goal of bringing all areas of the country into attainment by the deadlines that EPA sets. And so if we have data showing that an area will be in attainment by that deadline, there's no need for federal regulation because the other part of the Clean Air Act that's important is that the primary responsibility for ensuring compliance with the NAAQS falls upon the states. But Section 7407D1A2 says states shall designate as attainment any area other than an area identified in Clause 1 that meets the primary or secondary ambient air quality. It seems to me that you're trying to say that Bexar is in non-attainment presently but will be in attainment in the future. But the other than an area identified in Clause 1 requires a non-attainment designation in that case, doesn't it, if you read both 1 and 2 together? Well, I believe the parenthetical language Your Honor is referring to is going back to the contribution part of D1A1. So you don't think it has anything to do with attainment and whether or not, I mean, BEAR is not presently in attainment, is it? In 2020, assuming your argument, it will be. But it's not presently. That's right. And if I could explain why both the monitor data and the modeling are important. The monitor data show that there were two BEAR County monitors that were over the NAAQS. But they also show that they weren't over by much. That means that... Maybe I could choose to say we're going to maybe overlook like this because it's close enough. But they can't ignore the fact that it's not currently in attainment. And that's not our argument, Your Honor. It's not that it's close enough. It's that the being a little bit over means it would be at most a marginal attainment area. That means that the three-year period is what we're talking about. But I thought your Dictionary Act argument had to do with verb tenses. Am I not right about that? No, that's correct. That's correct. The present can't include the future unless the context... And you just mentioned the marginal. So the marginal, I'm looking at 7511. That has to do with classification for non-attainment areas. And one of those, as you know, is as a marginal area, right? Now, as a marginal area, it says, you know, that means that the attainment date will be three years, right, after a certain date. Why doesn't that hurt your argument? Why doesn't that inform the context of the statute as being, well, meets must be present. Otherwise, it would make meaningless the whole idea of a marginal non-attainment area. Well, no, Your Honor, because a marginal non-attainment area is one that has to come into compliance with the controls that accompany a non-attainment designation within that time. And what the modeling showed was that Bexar County would on its own, without the imposition of those very costly federal regulatory measures, be within the NACs by the deadline. I hear you, but let's just say if we decided that the context means we have to interpret meets as present tense only, does your argument fail? Yes. Counsel, I'm going to ask everybody this. So, I'm a little bit troubled by the fact that we're in October of 2019 about this, about the SIP. And in the, by 2020, you think you are going to be, we still have to do this, even though it's basically retroactive at this point and we're taking, it's taking so long. I see my time has expired, Your Honor. Please answer that question. But I'm troubled because these things happen often where it's a long time after, and we had one a few months ago where it was, we were well into the next period, and we were dealing with one, a previous one. So how does the timing of this, does this ever become moot or not? Well, no, I don't think so because the designation has to be made. The statute says as expeditiously as possible. Our basic point is that EPA was at least required to look at the modeling. Right, but if we weren't to get an opinion out until 2020 and then you are, then Bexar County is in compliance as a 70 PPB or whatever it is, then what difference does it make? Well, what we're asking for is, so the court, first of all, is limited to this administrative record. I'm just saying. But if the court were to set aside the Bexar County modification, which is what we're asking for, then presumably EPA could take new data that would include maybe modeling, maybe monitor data, and so it could make a decision based on that new data. But Texas can petition, though, can't they, to the EPA that it's no longer necessary? That it's, I'm sorry, Your Honor. That you don't, that in 2020 can Texas petition that they don't need to spend these billions that haven't been spent yet because it's not necessary? Well, if the record were expanded to include more data, Texas could make its argument for whatever position it wanted to take based on that data. Another way of asking that is suppose you lose right now, but Bexar County does come into attainment within the time period that you think it will based on the modeling that you have right now, what happens then? I think that would be data that would be before the agency, and the agency could then conduct a modification review, which if this court agrees with Texas here, would include all of the relevant data. Do we address the relevant data point, whether it should have included, even if you lose, on the dictionary point? Well, the dictionary act would be the only reason we would look to that future data. Right. We said that they should have looked at the whole, should we address, well, they should really look at everything. That's the more prudent practice. Do we need to, I mean, is it appropriate for us to address that, even if you're not going to win on the main argument that you're not in compliance? I think it would be helpful for the court to say what's within EPA's proper scope of review under the modification power. Okay. Thank you. Thank you. And we're not foreshadowing. We're just considering all the options. Yes, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the court, David Bock on behalf of Petitioner Sierra Club. Our petition arises out of EPA's unlawful failure to designate Atascosa, Comal, and Guadalupe counties as nonattainment, despite unequivocal evidence showing that these counties contributed to nonattainment in nearby Bexar County. The designations are unlawful in our view for two reasons. First, EPA failed to respect the plain language of the Clean Air Act. Section 107D of the Act requires EPA to designate as nonattainment any area that contributes to nonattainment in a nearby area. Are you asking us to read into that word contributes a 1% rule? Your Honor, we do not believe that EPA is required to adopt a 1% threshold, but we do believe that EPA is required to explain its departure from past practice. And here EPA has consistently treated the statutory term significantly contribute, which is a step higher than contribute, as being met when there's a 1% of the NAAQS contribution. And here Sierra Club raised in our comments this precedent and asked EPA to apply it here, and EPA failed to respond and failed to offer any explanation for why it was not applying that standard. So both Atascosa and Guadalupe are contributing more than 1% of the total ozone that reaches Bexar County. So applying that 1% threshold that EPA has consistently applied in the past, you would find a contribution here. Are you abandoning your venue argument? Judge Alrod, we are not abandoning it. We do believe it's an important issue for the court to decide. Normally you would have started with that, right? That's correct, Your Honor, and I didn't want the substance of the argument to be lost. Do you agree that under our precedent in Texas, the EPA, this is a loser? So the 2017 Texas versus EPA, Your Honor, I believe is the one you're referring to. So there's a few points on that. First of all, we would note that that opinion did indicate that it was not even intended to be binding on the panel, the marriage panel in that case. The court mentioned that, and I believe you wrote the opinion, Judge Alrod, that venue is a very context-specific consideration and that further development of the case might indicate that the designations were based on nationwide scope and effect. What about the 2016 case, which is a published opinion and is binding? Your Honor, that opinion we do believe is distinguishable, and that involved a SIP revision and the imposition of a federal implementation plan. And in that opinion, the court cited favorably the ATK launch systems case from the Seventh Circuit, which had transferred two designations for counties in Utah to the D.C. Circuit, ruling that they were part of a nationwide rulemaking. And I think that to go back to the 2017 ruling, we respectfully disagree with the analysis in that we think that the court was focused on the action, but actually under 307B1, if it's a nationally applicable rulemaking, it belongs in the D.C. Circuit. Even if that action is comprised of multiple federal register notices, multiple actions, it's still one nationwide rulemaking. We determined de novo. That's correct, Your Honor. Whether it has nationwide scope or effect. And one fact we might look at is whether the EPA said it was national rulemaking, and in this case it didn't. Well, Your Honor, the EPA does say in the federal register notice for the San Antonio designation that this completes the nationally applicable regulation designating all areas of the country for the 2015 ozone acts. That's at 83 Federal Register 35137. We agree that it didn't make a determination that it belonged in the D.C. Circuit, but it did note that this was a part of the nationally applicable rulemaking. And just as a practical matter, Your Honor, I think it's relevant that most, if not all, of the counsel in this case will also be in D.C. arguing El Paso, Texas, my hometown. So there's a policy argument for not having two circuits ruling on the same rulemaking for the same state. But to go back to, if I could just. Maybe it's better to have different circuits percolating up about issues. Your Honor, you certainly have done your share of percolating in this area, and no one can doubt your clean air expertise. If I could return to the merits, because I had one more point I wanted to make about that. So as I noted, in contrast to every other provision of the Clean Air Act that deals with pollution transport, Congress omitted the modifier significantly when it did Section 107D. And we think that actually makes sense, because, for example, for new bronze fills, it would make more sense for it to have to reduce pollution for San Antonio than it would to reduce pollution levels so that Cleveland, Ohio, can have better air. So we think that Congress made a deliberate choice to structure the statute in such a way that for nearby areas, you have a lower threshold. And EPA actually kind of turned the statute on its head and said, well, we're going to have a lower threshold for significant contribution to far downwind, but for the same area, we're not going to apply the same test. As I understand it, EPA uses a five-factor test in reaching this determination. Can you point to anything in its application of that test that you think is incorrect or arbitrary? Your Honor, we do think that EPA certainly has discretion to consider those five factors as its starting point. We think that really it's not any particular factor we have a problem with. We think that the balancing was done incorrectly. EPA's undisputed facts show that there's significant emissions from these three counties that were challenging, and it didn't really identify a factor that pressed against a nonattainment finding. It talks about meteorology, but meteorology is encompassed in the modeling that Texas did that showed more than 1% coming from Atascosa and Guadalupe. So the fact that prevailing winds might generally not be from Guadalupe is not, in our view, a rational basis for discounting modeling that shows, in fact, 1% was reaching it anyway. Do you have any comments on Texas's argument that some of the data wasn't considered by the EPA? Your Honor, I'm going to leave that to the last speaker, to our intervener, but I will say that we do think that EPA considered Texas's modeling in the appropriate way, which is, as it's said, it's not relevant for whether Bexar County is meeting the NAAQS now, but it is relevant for apportioning where pollution is being transported within the metropolitan area. Records show about the sort of the relative amount of pollution Bexar County versus the surrounding counties that you contend should have been designated nonattainment. And what's the ratio? Sure. So there's several places in the record. In EPA's final technical support document, which is CI-428, there is a table that shows the overall. This is page 10. Table 3 shows the overall emissions, and it certainly shows Bexar County dominating. How much? I mean, is it a massive amount? It's not a massive amount, Your Honor. It's, for example, for, well, and then the other place I would point, Your Honor, is the Texas is modeling CI-297 at page 154, table 6-1, and that showed about one part per billion of ozone coming from Guadalupe, for example, and I think it was about 11 parts per billion from Bexar County. So certainly not, you know, orders and orders of magnitude indifference. And the final point I wanted to just, oh, I see my time has expired, so. You can have another minute. I appreciate that, Your Honor. The final point I wanted to make is just that, just to give Your Honors a concrete understanding, so Texas's modeling showed that Guadalupe contributed more than one part per billion of ozone to the Camp Bullets monitor on days when it violated the standard, and that monitor was only exceeding by four parts per billion. So we think that for EPA to have found that this one part per billion was somehow de minimis, given how close, you know, how the small amount that is exceeding the standard was not a reasonable. You're talking a monitor to monitor comparison there, right? The four parts per billion monitor you're talking about is in Bexar County? So the one in Bexar County, the Camp Bullets, was exceeding by four parts per billion. And Texas's modeling shows that one part per billion reaching that monitor came from Guadalupe County, just one of the ones we're challenging. So about 25% of the contribution could be attributed just to that county. Thank you. Thank you so much, Your Honor. Good morning, Your Honor. Perry Rosen from the Department of Justice. With me is Seth Buxbaum from EPA. Let me start off with Texas's argument. As Your Honor pointed out, there is a difference in the statute between necessary and inappropriate. But let's not even go there. We don't even need to do that. Let's just go with necessary, whether it was necessary. Do you think we can resolve this case by not even getting into the difference between them? Absolutely. Absolutely. Because as Texas itself points out, EPA makes the decision as to what's necessary. It has broad discretion to do that. As the governor stated in his submissions to EPA, and particularly because the statute is worded that the administrator deems when it's necessary. That's as broad a discretion as you're going to get. And EPA determined that this aspirational approach that Texas takes, where it doesn't look at whether the area, Barr County, meets the Bear County. I'm sorry. That's all right. I knew I would get that wrong. XR something. I knew that X would confuse me. That Bear County does not meet the statute. They changed the wording of the statute to Bear County will not meet. And you can't change the clear, unambiguous wording of the statute. And as Judge Duncan pointed out, not only would it violate their approach, violate that provision, it would also violate the express language in Section 7411 that defines an area that's going to come into attainment within three years as a marginal non-attainment area. It is impossible for EPA to come in and declare that area in attainment when the statute itself defines it as non-attainment. You can't fit the definition any closer. They say it's going to come within attainment in three years. It's already been defined by Congress as non-attainment. Just to understand your argument, are you saying that even if we assume that necessary really does confine your discretion, let's assume that. You may not agree with that, but let's assume that. Even if it did, under that confined exercise of discretion, you couldn't do what Texas wants you to do. That's correct. That's correct. It would read out of the statute that marginal non-attainment definition that Congress put in there. And, again, going back to the original provision, the statute is worded as to whether they are in attainment today, when the measurement comes in, when the designation has to be made. I mean, let's take a step back. This is about protecting public health. It's been determined in a separate rulemaking that the 70 parts per billion is what's necessary to protect public health. You can't comply with that by saying we promise to do it at some time in the future. What happens, I mean, as a practical matter, what happens in 2020? You mean that they do come within 70? The attainment date is actually 2021. It does last three years. They have to come in with three years, three new years of data. I can't believe they're going to meet it by 2020. Well, that's great. In 2020, do they still have to spend all this money? And cost is one of the factors. Yes, they do. If Congress had written the statute differently to say, but, put in a but, but if you think you're going to come in to attainment within three years, maybe we'll back off. Now, there are provisions in the implementation stage, which is the stage three, where the states really have control. EPA has to approve their procedures so long as they comply with the statute. And that's in the rulemaking. EPA explained that we can address some of these things as to what's actually required within the state to meet those standards. That's where you deal with what's called the ozone trends. And they say it's trending down. And, by the way, it's not trending down. Because when Texas submitted its last set of data for 2014 to 2017, the two violating monitors actually went up. So that's just as a factual matter. But we're really here about the legal standard. Are the states that are not in attainment being subjected to fines by the EPA? They're not being subjected to fines. What happens is they're subjected to a whole series of requirements about putting in different technologies and things like that, where, again, under step three, states get to make the choice, for instance, do we put in a better program to check tailpipe emissions? Do we build new roads? Do we restrict factories from coming in? They make those determinations. If they don't meet the standards after the three years, they get kicked up to the next level. So a marginal would move up, and there are extra requirements. Other than being a good state, what's the impetus for making them comply with the EPA attainment levels? Particular penalties is also you can take away highway funds if there's noncompliance and those types of things. But you get kicked into higher levels, which what comes with that is greater requirements, greater steps that need to be taken. Does it make sense to ask whether Bexar County, which has been designated nonattainment by EPA, correct? Yes. Does it make sense to ask whether it's marginal, moderate, serious, or severe? Is that in the record? That is in the record. It's marginal, and it's based on the measurements at the monitors. Okay. As to the Dictionary Act, which was brought up, that argument is waived. I mean, the precedent is clear. It's Supreme Court precedent. It's strong precedent from this circuit that if you don't raise an argument, and in particular a legal— It's not waived. What's that? It's not waived. Okay. Okay. Then there's no application of the Dictionary Act in this case. It depends on whether it's—unless the context indicates otherwise, the Dictionary Act is applied. And here the context is quite clear. It's written in present tense. There's no ambiguity about that. It does not say—it says that a nonattainment area is any area that does not meet the max. It doesn't say that a nonattainment area is any area that will not meet the max or might not meet the max. It's quite clear. And in those cases, you do not go to the Dictionary Act. The logical extension of that is that if there's a statute that says that banks need to meet capitalization levels or that drug manufacturers need to meet certain test requirements to put a drug out, under Texas's argument, the banks could say, well, we don't comply now, but don't worry, we'll comply in a few years. The drug manufacturers can say, well, we don't comply now, and that may hurt people's health, but don't worry, we'll comply in a few years. That's not the way that the statute was written. Did the large emissions source get retired? I don't know, Your Honor. I don't know. The only thing I know from the record is that emissions have gone up at the two monitors. The only thing you know is that they've gone up at two monitors. You don't know if the large emissions source in Bexar County was retired as Texas, as some of their modeling said it would. I'm not aware of whether it has been or it hasn't. I believe environmental petitioners had some of that information in their comments, but I'm not sure whether that is in the record either. Finally, on the Dictionary Act, if you read the actual wording of the Act, it states that the Dictionary Act shall be applied in determining the meaning of any act of Congress and lest the context indicates otherwise, words used in the present tense include the future as well as the present. Well, that would set a whole new requirement that in showing compliance, you would have to show compliance in the present as the statute is expressly written and also in the future. Not either or. It doesn't give you a pass on the present. It says as well as, and that's how the Dictionary Act would be applied. Well, it just seems like the whole structure of the Act is hitched to particular dates, to meeting particular thresholds. That's correct. That's the context of the Act that we have to consider in applying the Dictionary Act, and that's why I brought up 7511, but that's just one. I'm sorry? That's just one example. Yes, that is just one example. Can you address what I believe is maybe what's not the final argument? The argument EPA improperly refused even to consider the modeling data that Texas identified, and it may not claim Chevron deference here. The modeling data, that's even assuming that you're correct on all this other, that is of some concern. Okay. I'm not sure the two parts of that question are connected. EPA, we think the statute is clear, but if it's unclear, EPA is clearly entitled to apply Chevron deference. Not to consider the modeling data is what you're saying. You meant that you didn't really apply Chevron deference because you didn't even consider the data that we would defer to you if you had, because that's this argument. It's right here, page 29 of the blue brief. EPA did consider the modeling. It considered it, particularly in context to the contribution portion of it. But as far as Bexar County itself, there was nothing in the modeling that could change the fact that the monitors show a violation. That's violation of the monitors equals a violation because they are not in attainment. Okay. Under the statute. You said that because it's future and instead of present tense, that you were precluded from referring to the modeling data in the federal register. The federal register says that. So you did not consider it. You were precluded from it because you initially determined that we were going to be present tense. Maybe this is a matter of semantics. For instance, EPA does consider modeling for certain circumstances, such as in exceptional events. Under the statute, if there's an exceptional event, and there was in Texas and El Paso County. So we can look to the modeling for those circumstances. And it will pull out some of the data based on that exceptional circumstances, based on the modeling, and maybe find that notwithstanding the monitoring, there is no violation. But for the most part, if absent something like that, as EPA has said in its regulations, as EPA has said in its guidance, as the President has said in his executive order, as the cases have said over and over again, if you don't pass the 70 parts per billion standard on the modeling, you're just simply not in attainment. Assuming that you didn't use the modeling because you didn't think it was pertinent, then aren't you at Chevron 1 and then we're not into deferring? You are at Chevron 1 until you get to the question of is it necessary. Necessary is not defined in the statute. You think that at Chevron 1 there's already baked in the cake this type of deference? Yes. Okay. Let me get to the environmental part. This is, of course, a different animal. There's no monitors in these three neighboring counties, so it's based on whether there's a contribution, which EPA has defined as a sufficient contribution, which is not challenged in this case and has been upheld by numerous courts as a proper basis for making that determination. So the question EPA faces is, is there a sufficient enough contribution to take counties that are not themselves violating the standard and subject them to all these different requirements, these technology requirements and other requirements, is there sufficient evidence to subject them to that based on the contribution to their county? EPA applies the weight of the evidence test, the five-part weight of the evidence test, which has been upheld time after time. Petitioners in their briefs emphasize the 1% test. There is no 1% test. Cases have said there is no single data point that you should rely on, that EPA is required to rely on, but there also is no 1% test in existence. It's a different provision. It has to do with state-to-state emissions, not the designation process. It's in the Step 3 implementation process under 7410. It's not in the designation process under 7407. Petitioners don't cite a single case where the 1% standard from Section 710 has been applied to designation process under 707. As I understand their argument today, though, they said they're not just relying on the 1%, that they're relying on all five factors, and that Komal raised it at least one part per million, raised the Bayer monitor if that's the right geography. But if it's not, you get the gist. Yeah. Yeah. Okay. So let's take that as one data point. They say the 1%. On page 14 of their reply brief, when we pointed out that the original numbers they pointed out from the record were incorrect because it was based on emissions and it was based on artificially limiting it to the eight-county area, what the same studies that they cite, and on page 14 they concede this, that the full contribution of the three counties at issue is 2.6% of the ozone in Bayer County. That's less than their own 1% standard. And under Section 710, that 1% standard is just used as a de minimis level. If you don't get to the 1%, you don't go to the second step and then look at all these other factors. If you take the three counties and 2.6% contribution, you divide it by three, they're under 1%. See, even if you applied that separate statutory 1% requirement, we're done. They don't even meet the de minimis standard. But EPA didn't do that. EPA looked at the five factors and they went through and they looked at, for instance, the population and traffic emissions. The three counties have between 2.5% and 8% of the population of Bayer County. Bayer County has 900% to 1,100% more vehicle miles. They have 2,500% to 3,400% more commuters within Bayer County. Looked at the air transport element of it. That's these emissions. Remember, we're talking about ultimately what the ozone levels are at the monitors. But you also look under this modeling at the emissions and then what happens to them and where it goes. So you look at the prevailing winds. The prevailing winds, for instance, as Sierra Club admitted, are generally from the south and the southeast. And two of the three counties are to the north and the east, out of the prevailing winds. The third county is to the south, but the one major source is 50 miles away. And directly north of that, that 50 miles, is the non-violating monitor. Now they say, well, maybe the winds go around the non-violating monitor and go to the violating monitors. And there's no real evidence of that. There's a depiction of different wind patterns in the record, in the EPA's documents. I think there is one that sort of goes around, but it starts way north of this single source. And the Bayer County also, what the record shows is Bayer County contributes 84% of the ozone to this eight-county region. So it's Bayer County who's the exporter of the emissions, not these other three counties. And then, as the petitioners pointed out themselves in their comments, most of the emissions that cause the problem in Bayer County come from the counties beyond the eight-county area and certainly beyond the three-county area. It's from these oil and gas operations. Under the study cited by EDF in their comments, 68% of the ozone violations in Bayer County come from beyond the eight-county area. And in the Alamo study, the Alamo County of Government study, which was also cited by petitioners, 80% of the emissions come from beyond the eight-county area. Council, what does the EPA seek for us to do today? I'm sorry? What do you wish us to do today? Deny the petitions for review. Do you have anything further? We have nothing further, Your Honor. I don't think I need to address venue unless you have any questions. I'm good. Thank you. Thank you. So on venue, the 2016 Texas v. EPA controls. 2017 Texas v. EPA isn't published, but the analysis is correct. The question turns on what the action encompasses here at just eight counties. I'm somewhat surprised that there's still a reliance on ATK launch. That's a rule that covered the whole country. So that issue is easily decided in our view. On the surrounding counties, I don't have much to add to what Mr. Rosen said. The 1% threshold from the good neighbor provision just doesn't apply here because the text of that provision is different. It includes words like amounts and emissions that would have to be taken into account. Here we're talking about a five-factor analysis. Emissions is only one piece of that puzzle. And as for the data itself, I think EPA points to the right spot on pages 90 to 91 of its brief. That's table 6-1. Again, I think Mr. Rosen has covered that ground. If I could save the rest of my time for rebuttal. Okay. Thank you. May it please the court. Peter Zalzow on behalf of Respondent Intervenors Environmental Defense Fund and Sierra Club. EPA's designation of Bexar County as a non-attainment area is unambiguously correct. And I'd just like to add a couple of points to the points that counsel for EPA made. The first is that the text of the statute here is clear. Meet is written in the present tense. And the context is overwhelming that the generalized rule in the Dictionary Act should not apply. Your Honor noted one piece of context, Section 7511, which expressly provides what marginal non-attainment areas need to do, the very type of area that Bexar County is, to come back into attainment. That would be superfluous if Texas's reading is right, which it is not. But there's far more context here that indicates that the generalized rule shouldn't apply. If you look to the plain text of 107 itself, where Congress indicated that an action should happen, could happen in the present or the future, it said so expressly. It uses the phrase within a certain period of time, numerous times in that provision. If you look at Section 107C, it says within 90 days. If you look at Section 107D3D, it says within 180 days. So where Congress meant for the present to include the future, it said it, and it didn't do so here. And that is overwhelming context that indicates that the Dictionary Act approach shouldn't apply. And there are others as well. We pointed to the re-designation provision in 107D4. That allows an area like Bexar County, if they come into attainment more quickly than the act, more quickly than they're required to under the act, they can seek to be re-designated as an attainment area. If they come in, even before they can spend the money on whatever they need to do. That's right, Your Honor. They realize on January 1st that they're in attainment. They go back to the EPA and say, we don't really need to do any of this, guys. You need to let us off the hook. That's exactly right. That provision expressly provides that they can be designated, re-designated as attainment if that's true. And the other thing that we think is important context about that provision is it says the area must have attained the standards. So Dictionary Act or not, it is clear that future modeling can't be used to predict attainment when there's a re-designation that occurs. Would we be at all concerned, though, that if we're supposed to, if there's, if the EPA was supposed to consider cost, and there's the cost relative to the fact that it's already going to be on its own? So, Your Honor, I'd like to address also a few of the factual issues, and cost was one of them. As counsel for EPA said, the act here, Congress has already made the judgment that when there's unhealthy levels of air quality, areas have to take actions to clean up that unhealthy level of air quality. And there's certainly some costs associated with it. With respect to these costs in particular, though, I'd note that these are the costs that, you know, one commenter has raised as part of the comment period. And the history of the Clean Air Act is one where these cost projections are very often wrong. And the other thing that I'd say about this is Texas is empowered. The state has wide latitude to choose among the options that it sees as best suited to restoring healthy air quality in Bexar County. So it can choose those options that are most cost effective and consistent with the state's plan for restoring healthy air. So the figure that they've cited is by no means a foregone conclusion. I would also, I see my time is running out, so would just like to finally close and say that, you know, the act gives wide latitude for states to determine how to meet air quality standards, but it does not give states the latitude in the first instance to determine whether or not to meet those standards. Affirming EPA's designation of Bexar County is important to protect the health of the 2 million residents of that county, and we ask the court to uphold the agency's determination. Thank you. And I guess we still have more, given the way that you all have structured this today. Oh, rebuttal. Yes, thank you, Your Honor. One more time for me. So necessary is not a word of broad discretion. That's what appropriate is. That's what we're pointing to is the distinction based on the dictionaries and based on the- What about McCullough v. Maryland? I'm sorry, Your Honor? What about McCullough v. Maryland, necessary and proper? Well- Can it expand and contract according to context? I guess perhaps, and I think you could probably find dictionaries that give some wiggle room there, but, again, we're talking about what EPA said necessary means here in the final action, page 35138. Well, in your view, what should it mean? If we were writing an opinion that said, well, necessary here has a particular connotation, what does it mean? It means needed to bring something in line with the statute to make sure that Congress's intent is being fulfilled, and that is my understanding of what EPA said necessary means in this context. And the question just then boils down to does the Dictionary Act apply here or not? And applying the Dictionary Act doesn't change the language of a statute. It just informs that language. And the argument that as well as in the tense provision means you have to show compliance both now and later just doesn't make sense on several levels. I mean, you don't have to show that something is both singular and plural. And it's also contrary to then-Judge Sotomayor's decision in Catskill Development, which read a statute to mean some land that will be in trust, held in trust by the government, is sufficient even though it isn't currently being held in trust. In that case, there wasn't all of this marginal information in the statute. Well, right. Every Dictionary Act analysis comes down to the statutory context. The only point I'm making there is that as a general principle, as well as doesn't mean what EPA is saying here, and that's consistent with what EPA said in the Excel Energy litigation relying on Catskill Development before this action came up. And so it's just an inconsistent position that EPA has taken here. Isn't your biggest problem, though, that there's a whole regime for how to deal with marginal unattainment? The 75-11 problem. There are certainly measures that kick in once something is designated nonattainment. And that's what – Why would they even have that if it was considered attainment when you're at that level? Because we wouldn't – I think this is an unusual case in that we have modeling showing that a state is going to get there on its own without the need for these federal regulations on the state that at the low end of the estimates would cost the region over a billion dollars. And so it's very important for the state to get this right. And based on that modeling and the statute as informed by the Dictionary Act, Texas designated this area an attainment area. Now, if we're wrong on this, then the natural result should be EPA should never get to look at modeling either, and an environmental group or another commenter should never be able to come in and say, oh, but look at our modeling. So that's another important implication of the Court's decision in this case. I believe those are the points I intended to cover unless the Court has further questions. I think we have your argument, and we appreciate it. Thank you. And Sierra Club's going to finish up with its rebuttal. I'm the last thing standing between you and lunch, so I will be quick here. Thank you, Your Honors. I'd just like to, David Bock on behalf of Sierra Club, just like to respond to a few points made by EPA. First, all of the arguments that they're making about the 1 percent threshold and the various points that we made are post hoc. They're not in the agency's decision document. As I mentioned, we raised the 1 percent issue squarely in our comments, and EPA did not address that at all. EPA talked about on page 14 of your reply brief, I think I've got that right, about a concession on some minimal amount of contribution. I forget the percentage, but is that accurate about your reply brief, or do you dispute that? I don't believe there was a concession. What the dispute was about was that we described in our opening brief, as EPA actually did in the technical support document, these percentages in terms of the percentage of the San Antonio area emissions. So it would be something like 8 percent of the San Antonio emissions come from Atascosa. And then they said, well, it's actually only 1 percent of the total ozone because a lot of the ozone is coming from further afield. So I wouldn't describe it as a concession. It was perhaps an agreement to say even if we characterize it as they do in saying we're looking at the total ozone as a baseline, it's still over 1 percent. So EPA suggested that somehow the data doesn't bear out a higher than 1 percent contribution, and that's just not correct. The table that Texas has in its modeling does show, as I mentioned, more than 1 part per billion coming from Guadalupe, which you don't have to be a genius in math to know that 1 divided by 70 is going to be higher than 1 divided by 100 or 1 percent. And similar numbers are in there for Atascosa County as well. The final point I will make is that it's a well-known canon of statutory construction that a statutory term is read in terms of the broader statutory context. And EPA is certainly correct that the good neighbor provision is a different provision. However, we do think that the difference between contribute and significantly contribute is important and reflects a judgment by Congress. I see my time is up. We've got it. Thank you so much. Thank you very much, counsel, to all of you. And I know that Atascosa correctly, so thank you very much. That concludes our argument sitting for this week. The court will stand in recess pursuant to the usual order. Thank you.